**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JESUS PIMENTEL; DAVID R. WELCH; JEFFREY O'CONNELL; EDWARD LEE; WENDY COOPER; JACKLYN BAIRD; ANTHONY RODRIGUEZ; RAFAEL BUELNA, and all persons similarly situated, <br><br> *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY OF LOS ANGELES, <br> *Defendant-Appellee.* | No. 18-56553 <br><br> D.C. No. 2:14-cv-01371-FMO-E <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Central District of California
Fernando M. Olguin, District Judge, Presiding

Argued and Submitted January 7, 2020
Pasadena, California

Filed July 22, 2020
Amended September 11, 2020

Before: Paul J. Watford, Mark J. Bennett, and
Kenneth K. Lee, Circuit Judges.

Order;
Opinion by Judge Lee;
Concurrence by Judge Bennett

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in an action brought pursuant to 42 U.S.C. § 1983 challenging a Los Angeles parking ordinance as violating the Eighth Amendment's Excessive Fines Clause.

Under the ordinance, if a person parks her car past the allotted time limit and forces people to drive around in search of other parking spaces, she must pay a $63 fine. And if she fails to pay the fine within 21 days, the City will impose a late-payment penalty of $63.

The panel held that the Excessive Fines Clause applies to municipal parking fines. The panel noted that the Supreme Court's recent decision in *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019), incorporated the Excessive Fines Clause of the Eighth Amendment to the states through the Fourteenth Amendment. The panel held that the *Timbs* decision affirmatively opened the door for Eighth Amendment challenges to fines imposed by state and local authorities. The panel therefore extended the four-factor

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

analysis set forth in *United States Bajakajian*, 524 U.S. 321 (1998) to govern municipal fines.

The panel held that the initial fine of $63 did not violate the Excessive Fines Clause because it was not grossly disproportionate to the offense of overstaying the time at a parking space.  The panel reversed, however, the district court's summary judgment in favor of the City as to the late payment penalty of $63.  The panel held that based on the record, it did not know the City's justification for setting the late fee at one hundred percent of the initial fine.  The panel therefore remanded for the district court to determine under *Bajakaijian* whether the City's late fee ran afoul of the Excessive Fines Clause.

Concurring in the judgment, Judge Bennett stated that because the City of Los Angeles conceded that the Excessive Fines Clause applied to parking fines, he concurred in the judgment.  Judge Bennett wrote separately because he did not believe the Excessive Fines Clause should routinely apply to parking meter violations.

## COUNSEL

Donald G. Norris (argued), Donald G. Norris ALC, Los Angeles, California; Donald R. Pepperman, Baker Marquart LLP, Los Angeles, California; for Plaintiffs-Appellants.

Gerald M. Sato (argued) and Arlene N. Hoang, Deputy City Attorney; Gabriel S. Dermer, Assistant City Attorney; James P. Clark, Chief Assistant City Attorney; Michael N. Feuer,

City Attorney; Office of the City Attorney, Los Angeles, California; for Defendant-Appellee.

## ORDER

The Opinion filed on July 22, 2020, is amended as follows:

On slip opinion page 14, lines 9–11, delete: "And in any event, appellants appear to have brought a facial challenge, so means-testing makes little sense here."

The Clerk shall file the amended opinion submitted with this Order. Plaintiffs-Appellants' petition for rehearing is denied as moot. Further petitions for rehearing and petitions for rehearing en banc will not be entertained.

## OPINION

LEE, Circuit Judge:

In the opening scene of *La La Land*, drivers stuck in traffic spontaneously sing and dance on top of their cars and in the streets. Hollywood, however, rarely resembles reality. On any given day, Los Angelenos sigh and despair when mired in traffic jams. One small way the City of Los Angeles tries to alleviate traffic congestion is to impose time restrictions — and fines — for limited public parking spaces. If a person parks her car past the allotted time limit and forces people to drive around in search of other parking spaces, she must pay a $63 fine. And if she fails to pay the fine within 21 days, the City will impose a late-payment penalty of $63.

Appellants, who had parking fines and late fees levied against them, challenge the Los Angeles parking ordinance as violating the Eighth Amendment's Excessive Fines Clause. We hold that the Excessive Fines Clause applies to municipal parking fines. We affirm the district court's summary judgment order that the initial parking fine is not grossly disproportionate to the offense and thus survives constitutional scrutiny. But we reverse and remand for the district court to determine whether the City's late fee runs afoul of the Excessive Fines Clause.

## BACKGROUND

The City of Los Angeles imposes civil fines for parking meter violations. The fine for overstaying the allotted time is $63. If the driver fails to pay that fine within 21 days, the City levies a late fee of another $63. After 58 days of nonpayment, the City issues a second late-payment penalty of $25; then after 80 days, the driver is subjected to a $3 Department of Motor Vehicles registration hold fee, as well as a $27 collection fee. In sum, a person who overstays a metered parking spot faces a fine of anywhere from $63 to $181, depending on her promptness of payment. Approximately $12.50 to $17.50 of the initial $63 is reserved for the County and State. The remainder is disbursed to the City's coffers.

Jesus Pimentel and the other appellants sued the City of Los Angeles under 42 U.S.C. § 1983, asserting that the fines and late payment penalties violate the Eighth Amendment's Excessive Fines Clause and the California constitutional counterpart, Article 1, Section 17. The district court granted summary judgment to the City, ruling that the fines and late fees were not "grossly disproportional" to the underlying offense of overstaying the parking time limit and therefore

did not violate the Excessive Fines Clause. Appellants timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* the district court's grant of summary judgment. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

## ANALYSIS

## I. The Eighth Amendment's Excessive Fines Clause applies to municipal parking fines.

The Eighth Amendment of the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Importantly here, the second clause — the Excessive Fines Clause — "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Austin v. United States*, 509 U.S. 602, 609–610 (1993) (internal quotation marks and citation omitted).

The Excessive Fines Clause traces its lineage back to at least the Magna Carta which "guaranteed that '[a] Free-man shall not be [fined] for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement . . . .'" *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (citation omitted). For centuries, authorities abused their power to impose fines against their

enemies or to illegitimately raise revenue.  *See id.* at 694 (Thomas, J., concurring) (noting, for example, that the Star Chamber "imposed heavy fines on the king's enemies"). That fear of abuse of power continued to the colonial times. During the founding era, fines were "probably the most common form of punishment," and this made "a constitutional prohibition on excessive fines all the more important."  *Id.* at 695 (internal citations and quotation marks omitted).  Like the other enumerated rights in the Bill of Rights, the Eighth Amendment was established to shield the people from governmental overreach.  *See id.* at 696 (noting that the Eighth Amendment is "an admonition" against "arbitrary reigns" by the government).  Indeed, as the Supreme Court recently stated, the "right against excessive fines . . . has been consistently recognized as a core right worthy of constitutional protection."  *Id.* at 698.

The Supreme Court has held that a fine is unconstitutionally excessive under the Eighth Amendment if its amount "is grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 336–37 (1998).  To determine whether a fine is grossly disproportional to the underlying offense, four factors are considered: (1) the nature and extent of the underlying offense; (2) whether the underlying offense related to other illegal activities; (3) whether other penalties may be imposed for the offense; and (4) the extent of the harm caused by the offense.  *See United States v. $100,348 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004) (enunciating the "*Bajakajian* factors").  While these factors have been adopted and refined by subsequent case law in this circuit, *Bajakajian* itself "does not mandate the consideration of any rigid set of factors."  *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003).

Excessive Fines Clause claims generally arise in the criminal forfeiture context. The Court in *Bajakajian*, for example, addressed the criminal forfeiture of a large sum of money for failing to report it during international travel in violation of federal law. 524 U.S. at 324. Many other courts in this circuit and elsewhere have mainly cited *Bajakajian* in similar criminal contexts. *See, e.g.*, *$100,348 in U.S. Currency*, 354 F.3d at 1113–14 (criminal money forfeiture for knowingly making false statements in connection with failure to report international transport of cash); *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015) (criminal forfeiture of a residence for its use in harboring an illegal alien); *United States v. Chaplin's, Inc.*, 646 F.3d 846, 849–50 (11th Cir. 2011) (criminal forfeiture of jewelry store's inventory for its use in a money laundering operation); *United States v. Cheeseman*, 600 F.3d 270, 273 (3d Cir. 2010) (criminal forfeiture of firearms and ammunition as a consequence of defendant's drug addiction); *United States v. Wallace*, 389 F.3d 483, 484 (5th Cir. 2004) (criminal forfeiture of an aircraft for defendant's knowing and willing operation of an unregistered aircraft).

While the Supreme Court has not yet addressed whether the Excessive Fines Clause applies only in the criminal forfeiture realm, this court has applied *Bajakajian* to civil penalties imposed by federal law. In *Vasudeva v. United States*, for example, we reviewed the constitutionality of civil monetary penalties for trafficking in federal food stamps. 214 F.3d 1155, 1161–62 (9th Cir. 2000). Similarly, in *Balice v. U.S. Department of Agriculture*, we applied the *Bajakajian* factors to assess the constitutionality of civil fines levied pursuant to the Agricultural Marketing Agreement Act. 203 F.3d 684, 698–99 (9th Cir. 2000).

Today, we extend *Bajakajian*'s four-factor analysis to govern municipal fines. We do so because the final link in the chain connecting the Eighth Amendment to municipal fines is forged by the Supreme Court's recent *Timbs* decision. 139 S. Ct. 682. The Supreme Court in *Timbs* incorporated the Excessive Fines Clause of the Eighth Amendment to the states through the Fourteenth Amendment. *Id.* at 686–87. We hold that the *Timbs* decision affirmatively opens the door for Eighth Amendment challenges to fines imposed by state and local authorities.

## II. The initial fine of $63 does not violate the Excessive Fines Clause.

Appellants challenge the constitutionality of the City's initial parking fine of $63. Applying the *Bajakajian* factors, we conclude that the initial parking fine is not grossly disproportionate under the Eighth Amendment and affirm the district court's grant of summary judgment in favor of the City for the initial fine.

Looking to the first *Bajakajian* factor, we must determine the nature and extent of the underlying offense. *See $100,348 in U.S. Currency*, 354 F.3d at 1122. Courts typically look to the violator's culpability to assess this factor. In *Bajakajian*, for example, the Supreme Court assessed defendant Bajakajian's culpability based on his attempt to export over $350,000 in cash from the United States by concealing it during an international flight. 524 U.S. at 324–25. Bajakajian pleaded guilty to violating 31 U.S.C. § 5316, which requires anyone who transports more than $10,000 out of the country to report the transfer. *Id.* at 325. The federal government then sought forfeiture of the cash. *Id.* at 325–26. The Supreme Court found that Bajakajian's culpability was minimal because the crime was "solely a reporting offense." *Id.* at 337–38.

In *United States v. $100,348 in U.S. Currency*, this court found that culpability increased if defendant's violation involved reckless behavior. 354 F.3d at 1123. There, defendant had similarly failed to report the international export of a large sum of money, but he ignored several potential red flags. According to the defendant, a family friend had given him the money and instructed him to return with it to Israel. *Id.* at 1114–15. He did not ask about the source of the money but told his friend that he would not be responsible if anything happened to it. *Id.* at 1115. The defendant further testified that he asked essentially no questions about the money — nothing about its source, its purpose for being sent to Israel, or why the family friend hadn't entrusted him with traveler's checks instead. *Id.* at 1123. We found that his reckless behavior showed "more than a minimal level of culpability." *Id.*

So if culpability is high or behavior reckless, the nature and extent of the underlying violation is more significant. Conversely, if culpability is low, the nature and extent of the violation is minimal. It is critical, though, that the court review the specific actions of the violator rather than by taking an abstract view of the violation. *See United States v. 3814 NW Thurman St.*, 164 F.3d 1191, 1197 (9th Cir. 1999), *opinion amended on denial of reh'g sub nom.*, 172 F.3d 689 (9th Cir. 1999), *superseded by statute on other grounds*, 18 U.S.C. § 983(d) (2000).

We note that benign actions may still result in some non-minimal degree of culpability. The Seventh Circuit's decision in *Towers v. City of Chicago* is instructive. There, the Seventh Circuit reviewed a municipal ordinance that fined car owners who allowed their vehicle to be used to transport illegal guns or drugs by others, even if they were unaware that their vehicle was used for that purpose.

173 F.3d 619, 625–26 (7th Cir. 1999). The court emphasized the owners' failure to report their cars as stolen (which implies consent to use), and further noted that an owner necessarily accepts the risks when she lets another person borrow her vehicle. *Id.* The *Towers* court rejected "the notion that the plaintiffs must be considered completely lacking in culpability," even though the act triggering the fine was merely letting another person borrow their vehicle and nothing more. *Id.* at 625.

We find the Seventh Circuit's reasoning persuasive. Even if the underlying violation is minor, violators may still be culpable. Here, plaintiffs are indeed culpable because there is no factual dispute that they violated Los Angeles Municipal Code § 88.13 for failing to pay for over-time use of a metered space. But we also conclude that appellants' culpability is low because the underlying parking violation is minor. We thus find that the nature and extent of appellants' violations to be minimal but not de minimis.

Moving to the second *Bajakajian* factor, we must determine whether the underlying offense relates to other illegal activities. *See $100,348 in U.S. Currency*, 354 F.3d at 1122. This factor is not as helpful to our inquiry as it might be in criminal contexts. We only note that there is no information in the record showing whether overstaying a parking meter relates to other illegal activities, nor do the parties argue as much.

Similarly, the third *Bajakajian* factor — whether other penalties may be imposed for the violation — does not advance our analysis. *See id.* Neither party suggests that alternative penalties may be imposed instead of the fine, and the record is devoid of any such suggestion.

Turning to the fourth factor, we must determine the extent of the harm caused by the violation.  *See id.*  The most obvious and simple way to assess this factor is to observe the monetary harm resulting from the violation.  In *3814 NW Thurman St.*, this court held that because "neither creditors nor the government suffered any actual loss" from the violation, defendant's "violations were at the low end of the severity spectrum."  164 F.3d at 1198.  In *Mackby*, on the other hand, we reviewed a civil fine imposed under the False Claims Act and were persuaded that because the government was monetarily harmed by defendant's fraudulent conduct, the extent of the harm was significant.  339 F.3d at 1018–19.

But our review of the fourth *Bajakajian* factor is not limited to monetary harms alone.  Courts may also consider how the violation erodes the government's purposes for proscribing the conduct.  In *Vasudeva*, this court rejected the violators' claim that no harm resulted because the trafficked food stamps were never redeemed.  214 F.3d at 1161.  We found that a narrow focus on monetary harms failed to capture the full scope of the injury.  Instead, we held that trafficking in food stamps is harmful, regardless of redemption status, because the very act of trafficking undermines the viability of the program.  *Id.*  Similarly in *Mackby*, this court held that non-monetary injury may be considered in assessing the harm caused by the violation. There, defendant provided legitimate physical therapy services to Medicare patients but was ineligible to receive payment from the Medicare Part B program.  339 F.3d at 1014–15.  The defendant fraudulently used the credentials of his father, a physician, to make claims against the program.  *Id.* at 1015.  The court held that fraudulent claims for otherwise legitimate services "make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system."  *Id.* at 1019; *see*

*also Balice*, 203 F.3d at 699 (noting that the violation "undermined the Secretary's efforts to protect the stability of the almond market"); *Towers*, 173 F.3d at 625 (finding the violation harmed the City's interests in public safety even though the harm is "not readily quantifiable").

Here, there is no real dispute that the City is harmed because overstaying parking meters leads to increased congestion and impedes traffic flow. Without material evidence provided by appellants to the contrary, we must afford "substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments." *Bajakajian*, 524 U.S. at 336 (quoting *Solem v. Helm*, 463 U.S. 277, 290 (1983)).

Pimentel further argues that the City has proffered no quantitative evidence showing that the initial fine deters parking violations or promotes compliance. While the Excessive Fines Clause curbs governmental overreach, the Supreme Court in *Bajakajian* also stated that legislatures nonetheless retain "broad authority" to fashion fines. *Id.* It further cautioned against "requiring strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense." *Id.* Instead, the "amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334.

In light of that guidance from the Supreme Court, we do not believe that the Eighth Amendment obligated the City to commission quantitative analysis to justify the $63 parking fine amount. That amount bears "some relationship" to the gravity of the offense. While a parking violation is not a serious offense, the fine is not so large, either, and likely deters violations.

The most analogous case is the Seventh Circuit's decision in *Towers*. 173 F.3d 619. In that case, the fine was $500 for the act of a car owner unwittingly allowing another to borrow their vehicle to be used for criminal ends. *Id.* at 626. The Seventh Circuit acknowledged that $500 is not a "trifling sum," but ruled that the City was "entitled to take into consideration that ordinances must perform a deterrent function." *Id.* The court thus held that a $500 fine is "large enough to function as a deterrent," but "is not so large as to be grossly out of proportion to the activity that the City is seeking to deter." *Id.* Likewise here, the $63 parking fine is sufficiently large enough to deter parking violations but is "not so large as to be grossly out of proportion" to combatting traffic congestion in one of the most congested cities in the country.

Pimentel argues that an Excessive Fines Clause analysis must incorporate means-testing to assess a violator's ability to pay. This is a novel claim in this circuit, and one the Supreme Court expressly declined to address in *Bajakajian*. *See* 524 U.S. at 340 n.15. The Court in *Timbs* likewise left the question open. *See* 139 S. Ct. at 688. We, too, decline Pimentel's invitation to affirmatively incorporate a means-testing requirement for claims arising under the Eighth Amendment's Excessive Fines Clause.

Considering the *Bajakajian* factors, we hold that the City's initial parking fine of $63 is not grossly disproportional to the underlying offense of overstaying the time at a parking space. We affirm the district court's grant of summary judgment in favor of the City of Los Angeles on this issue.

### III. The district court erred by granting summary judgment in favor of the City of Los Angeles as to the late payment penalty of $63.

While we affirm the district court's grant of summary judgment on the initial parking fine, we cannot endorse the court's conclusion that the late fee does not constitute an excessive fine — at least based on the record presented to us. Notably, the district court did not apply the *Bajakajian* factors to the late fee. Instead, it rejected the challenge to the late fee in a footnote citing two cases that themselves only provide conclusory assertions. *See Pimentel v. City of Los Angeles*, No. CV-14-1371-FMO, 2018 WL 6118600, at *6 n.12 (C.D. Cal. May 21, 2018) (citing *Wemhoff v. City of Baltimore*, 591 F. Supp. 2d 804, 809 (D. Md. 2008); *Popescu v. City of San Diego*, No. 06-CV-1577-LAB, 2008 WL 220281, at *4 (S.D. Cal. Jan. 25, 2008)). We thus reverse and remand on this issue.

As the Supreme Court recently reminded us, the Excessive Fine Clause is "fundamental to our scheme of ordered liberty, with deep roots in our history and tradition." *Timbs*, 135 S. Ct. at 686–87 (internal quotation marks and alterations omitted). This right to be free from excessive governmental fines is not a relic relegated to the period of parchments and parliaments, but rather it remains a crucial bulwark against government abuse. The government cannot overstep its authority and impose fines on its citizens without paying heed to the limits posed by the Eighth Amendment. Yet in its brief to this court, the City of Los Angeles did not even bother addressing the constitutionality of its late fee. Based on the record, we do not know the City's justification for setting the late fee at one hundred percent of the initial fine.

We remand for the court to determine under *Bajakajian* whether the late payment penalty of $63 is grossly disproportional to the offense of failing to pay the initial fine within 21 days.

## CONCLUSION

We **AFFIRM** the grant of summary judgment in favor of the City for the initial parking fine of $63, and **REVERSE and REMAND** the grant of summary judgment in favor of the City for the late payment penalty of $63.

---

BENNETT, Circuit Judge, concurring in the judgment:

Because the City of Los Angeles conceded that the Excessive Fines Clause applied to parking "fines," I concur in the judgment. I write separately because I do not believe the Excessive Fines Clause should routinely apply to parking meter violations.

The Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, as *punishment* for some offense." *Austin v. United States*, 509 U.S. 602, 609–610 (1993) (internal quotation marks and citation omitted). Thus, for example, the Excessive Fines Clause seldom applies to punitive damages awards in civil suits between private parties because "the primary focus of the Eighth Amendment was the potential for governmental abuse of its 'prosecutorial' power, not concern with the extent or purposes of civil damages." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 266–67 (1989). The threshold question then is whether Los Angeles is using its government (sovereign) power to "extract payments" or whether it is acting in a proprietary

capacity by merely "renting" out the parking spaces, analogous to a privately owned parking garage.[1]

Because "the Excessive Fines Clause of the 1689 Bill of Rights" is a "direct ancestor of our Eighth Amendment," *Browning-Ferris*, 492 U.S. at 268, I begin with the English common law understanding of sovereign power. English law did not distinguish between our modern conception of the government's rights arising from owning property and the exercise of sovereign power: "The king not only exercised the lawmaking powers of a sovereign; as the head of the feudal landholding system, he also maintained extensive proprietary rights." Michael C. Blumm & Lucas Ritchie, *The Pioneer Spirit and the Public Trust: The American Rule of Capture and State Ownership of Wildlife*, 35 Envtl. L. 673, 679 (2005). Within this framework, English courts had to determine whether the King's ownership derived from his powers as a sovereign or as a property owner. For example, English courts eventually determined that the King owned the wildlife in England under his sovereign power, or prerogative. *See Bowlston v. Hardy* (1596) 78 Eng. Rep. 794, 794 (K.B.) (noting that no one could own wild animals except "by grant from the King, or by prescription . . . for the Queen hath the royalty in such things whereof none can have any property"). This "meant that the king was obligated to manage wildlife for the benefit of all the people of his kingdom rather than his own individual interest." Michael C. Blumm & Aurora Paulsen, *The Public Trust in Wildlife¸* 2013 Utah L. Rev. 1437, 1454 (2013).

This view of sovereignty and property carried over into the laws of the United States, subject to modification by

---

[1] On top of rent, Los Angeles also charges extra for "holdovers" and late payments.

subsequent state and federal laws and the Constitution.[2] *Shively v. Bowlby*, 152 U.S. 1, 14 (1894). After the revolution, "all the rights of the crown and of parliament vested in the several states, subject to the rights surrendered to the national government by the constitution of the United States." *Id.* at 14–15.

The California Supreme Court explained 130 years ago that municipal corporations, like Los Angeles, are "clothed with certain functions of local government, and invested with the management of public property within their respective boundaries." *Bd. of Educ. v. Martin*, 28 P. 799, 801 (Cal. 1891). While these corporations may own private property unrelated to their governmental functions, that "does not deprive [such property] of this public characteristic." *Id.* And when a municipality has set aside property like streets and public squares for public use, such property is public property. "The proprietary interest in all such property belongs to the public . . . whether the legal title to such property be in the municipality or any of its officers or departments, it is at all times held by it or them for the benefit of the whole public, and without any real proprietary

---

[2] For example, New York City's water commission—a municipal body that could assert sovereign immunity—was nevertheless found to be potentially liable for the construction of a dam for drinking water because a private corporation could have built the dam. *See Bailey v. Mayor of New York*, 3 Hill 531 (N.Y. Sup. Ct. 1842). The court distinguished between the municipal entity acting as a public or government actor versus as a private entity. *Id.* at 539; *see also City of Logansport v. Pub. Serv. Comm'n*, 177 N.E. 249, 252 (Ind. 1931) (noting that the city was acting "in its private business capacity and not in its public governmental capacity" when it operated an electric utility and sold power to the public); *City of Tacoma v. City of Bonney Lake*, 269 P.3d 1017, 1020 (Wash. 2012) ("A city's decision to operate a utility is a proprietary decision, as is its right to contract for any lawful condition.").

interest therein." *Id.* at 802. While this suggests that Los Angeles—a California municipal corporation—is using its sovereign power when it "leases" parking spaces, that does not end the inquiry.[3]

Today, our "[g]overnment plays many parts. When it acts in one of its many proprietary roles (employer, purchaser, or landlord, to name a few), it must be able to enforce reasonable and germane conditions." *Rucker v. Davis*, 237 F.3d 1113, 1138 (9th Cir. 2001) (Sneed, J., dissenting), *rev'd sub nom. Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S 125 (2002). Accordingly, in these circumstances, when the government is not acting in a sovereign capacity, the Supreme Court has found that traditional Constitutional constraints do not apply or are relaxed. *See, e.g.*, *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976) (recognizing that states acting as market participants rather than market regulators are not subject to the constraints of the Commerce Clause); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998) (government's ability to allocate funding competitively is more flexible than through direct regulation).

---

[3] And there are at least fifty sets of such principles governing municipal corporations among the several states, and likely many more, as some states understandably treat large cities differently than small towns, and others' rules depend on the exact nature of the municipality— county, township, borough, city, town, or village. *See, e.g.*, *Chadwick v. Scarth*, 383 N.E. 2d 847 (Mass. App. Ct. 1978) (discussing the difference between a city or a town under Massachusetts law); *Walters v. Cease*, 388 P.2d 263, 264 n.1. (Alaska 1964) (noting that in Alaska "all local government powers are vested in boroughs and cities"); *see also generally* 1 McQuillin The Law of Municipal Corporations §§ 2:41–62 (3d ed. 2019).

Cities that meter on-street parking may thus be acting in a similar capacity as the owner of a private parking garage—both are leasing the spaces for a specific sum. And the Supreme Court has not, of course, recognized a constitutional guarantee to parking. *Cf. Lindsey v. Normet*, 405 U.S. 56, 74 (1972) (no constitutional right to housing). Absent statutory restrictions, a private landlord may freely choose what rate it charges for parking, holdover and late fees included. I see no constitutional reason why cities like Los Angeles cannot similarly freely set parking rates, including holdover and late fees, unrestrained by the Constitution, because "the definition of landlord-tenant relationships [is] [a] legislative, not judicial, function[]." *Id.*[4] Ensuring that the tenant timely vacates and pays is likely an appropriate sovereign/trustee function. Or to put it another way, Los Angeles should be able to generally structure its parking rates, including by deterring holdovers and encouraging prompt payment, restrained only by state law and its own municipal code and regulations.

The Supreme Court has called this government/property distinction (in other areas of law) a "quagmire that has long plagued the law of municipal corporations." *Indian Towing Co. v. United States*, 350 U.S. 61, 65 (1955). When *Indian Towing* was decided, tort law claims regularly turned on the distinction between the municipal government acting in its sovereign capacity or as a property owner, and states differed

---

[4] Because, as Rousseau noted, "the world of imagination is boundless," I am sure some creative municipality could devise a parking scheme that runs afoul of the Constitution. But that should not mean that *every* municipal parking scheme is subject to attack under the Excessive Fines Clause and the Civil Rights Acts.

widely as to municipal liability.**[5]** *Id.* at 65 n.1. I think it an odd outcome for a municipality (located in a jurisdiction retaining common law sovereign immunity) acting as a private property owner to be nonetheless held liable for *civil rights violations* because it is using its government power**[6]** to collect parking charges.**[7]**

Finally, we all know that many municipalities rent out parking or otherwise charge for use of their property (including assessing holdover and late fees). I simply do not believe that every time a city or town does so, it should be subject to a § 1983 action. Even looking only at parking spaces, the potential for federal court litigation is endless. I see Los Angeles's charges, including its holdover and late fees, as routine. The Congress, in enacting the Civil Rights

---

**[5]** Today most states have abrogated the common law doctrine of sovereign immunity and have replaced it with statutes granting immunity for some government actions but not others. *See* Hugh D. Spitzer, *Realigning the Governmental/Proprietary Distinction in Municipal Law*, 40 Seattle U. L. Rev. 173, 190 (2016). And the United States has done exactly that in the Federal Tort Claims Act. *See* 28 U.S.C. §§ 1346(b), 2671–2680.

**[6]** Of course, it is that government power itself that brings section 1983 into play. But the Plaintiffs' complaint here primarily goes to the amounts assessed, and not the means of collection, and my concern is with routinely subjecting those *amounts* to federal court scrutiny.

**[7]** Unsurprisingly, the National Park Service is putting meters on the National Mall in Washington, D.C., to "create more frequent turnover of limited parking spaces; [to] encourage the use of public transportation options, . . . and [to] provide revenue to create and improve affordable visitor transportation." National Park Service, https://www.nps.gov/na ma/planyourvisit/parking-meter-faq.htm (last visited July 13, 2020). These are some of the same reasons Los Angeles has parking meters. I hope the Park Service's late charges are not "excessive," or the District of Columbia courts may soon have some increased activity.

Acts following the adoption of the Fourteenth Amendment, certainly did not intend for those noble statutes to redress the types of "rights" asserted here. *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 684 (1978) (quoting approvingly the characterization of the purpose of § 1983 as "in aid of the preservation of human liberty and human rights"). And neither, I think, did the authors of the Eighth or Fourteenth Amendments. I believe applying the Excessive Fines Clause to the types of charges at issue, improperly trivializes the Eighth Amendment, the Fourteenth Amendment, and the Civil Rights Acts.[8]

But, because Los Angeles did not contest this issue either below or on appeal,[9] I concur in the judgment.

---

[8] I think that if federal courts must determine whether particular parking holdover or other charges violate the Excessive Fines Clause, there must be some ratio or amount below which the fine or penalty is unlikely to be or cannot be excessive as a matter of law. Absent such a ratio or amount, federal courts will need to apply *United States v. Bajakajian*, 524 U.S. 321 (1998) in the way the majority did here, including, in every case, reviewing "the specific actions of the violator rather than by taking an abstract view of the violation." Maj. Op. at 10. I simply do not see that as an appropriate or productive way to proceed, even if courts must apply the Excessive Fines Clause to these types of parking charges. In an analogous context, the Supreme Court has suggested that a punitive damages award that is within a single digit multiplier of the compensatory damage award is "more likely to comport with due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Though such a "baseline" might cut back on litigation or simplify the required analysis, it also highlights the legislative nature of the judgments at issue in our passing on the constitutionality of different types of *parking* charges.

[9] Oral Argument at 16:40–17:50, *Pimentel v. City of Los Angeles*, 18-56553 (9th Cir. Jan. 7, 2020).