**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JESUS PIMENTEL; DAVID R. WELCH; JEFFREY O'CONNELL; EDWARD LEE; WENDY COOPER; JACKLYN BAIRD; RAFAEL BUELNA, and all persons similarly situated,

*Plaintiffs-Appellants*,

and

ANTHONY RODRIGUEZ,

*Plaintiff*,

v.

CITY OF LOS ANGELES,

*Defendant-Appellee*,

v.

ELEN KARAPETYAN,

*Movant*.

No. 22-55946

D.C. No. 2:14-cv-01371-FMO-E

OPINION

Appeal from the United States District Court
for the Central District of California
Fernando M. Olguin, District Judge, Presiding

Argued and Submitted January 25, 2024
Pasadena, California

Filed September 9, 2024

Before:  Johnnie B. Rawlinson, Mark J. Bennett, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Lee;
Partial Concurrence and Partial Dissent by Judge Bennett

---

### SUMMARY[*]

**Excessive Fines Clause**

The panel reversed the district court's summary judgment for the City of Los Angeles in a class action alleging that the City of Los Angeles' $63 penalty for failure to timely pay a fine for a parking meter violation, which is set at 100 percent of the $63 parking fine, violates the Eighth Amendment's Excessive Fine Clause.

The panel reversed the district court's summary judgment to the City on appellants' facial challenge to the late fee because a genuine factual dispute exists about the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

City's basis for setting the late fee at 100 percent of the parking fine. Given this factual dispute, the panel could not say as a matter of law that the late fee is not "grossly disproportional" to the harm caused by the untimely payment of the parking fine under the Excessive Fines Clause. The panel could not determine gross disproportionality as a matter of law because the City provided no evidence on how it set the $63 late fee amount. Accordingly, based on the record before the panel at the summary judgment stage, the panel could not conclude as a matter of law that the City's late payment penalty is not unconstitutionally excessive.

Addressing appellants' as-applied challenge, in which they assert that several of them lack the financial means to pay the fine within 21 days, the panel declined to incorporate means-testing into the Excessive Fines Clause analysis.

Concurring in part and dissenting in part, Judge Bennett agreed with the majority that the district court did not err in rejecting plaintiffs' as-applied challenge, but would hold that the Excessive Fines Clause does not prohibit imposing the $63 late-fee penalty because legislative bodies are owed substantial deference and the City met its low burden of showing that the late fee is not disproportionate to the harm caused by untimely payment.

**COUNSEL**

Paul L. Hoffman (argued) and John C. Washington, Schonbrun Seplow Harris Hoffman & Zeldes LLP, Hermosa Beach, California; Donald R. Pepperman, Waymaker LLP, Los Angeles, California; Donald G. Norris, Donald G. Norris a Law Corporation, Los Angeles, California; for Plaintiffs-Appellants.

Timothy W. Martin (argued), Arlene N. Hoang, and Gabriel Dermer, Deputy City Attorneys; Scott Marcus, Chief Assistant City Attorney; Denise C. Mills, Chief Deputy City Attorney; Hydee F. Soto, City Attorney; Los Angeles Office of the City Attorney, Los Angeles, California; for Defendant-Appellee.

**OPINION**

LEE, Circuit Judge:

In Los Angeles—the "City of Angels"—trying to find a parking spot can sometimes feel like traipsing through Dante's nine circles of hell. To make more parking spaces available and decrease traffic congestion, the City levies a $63 fine on those who overstay their allotted parking time. We upheld this fine against an Excessive Fines Clause challenge under the Eighth Amendment, deferring to the City's judgment in fashioning a fine to further these goals. *Pimentel v. City of Los Angeles*, 974 F.3d 917, 922, 925 (9th Cir. 2020) (*Pimentel I*). But we remanded to determine whether the City's late fee of $63—which is imposed if a

driver does not pay the $63 parking fine within 21 days—violates the Excessive Fines Clause.

Based on the record before us, we hold that a genuine factual dispute exists about the City's basis for setting the late fee at 100 percent of the parking fine. And given this factual dispute, we cannot say as a matter of law that the late fee is not grossly disproportional to the harm caused by the untimely payment of the parking fine under the Excessive Fines Clause.

While we generally defer to the legislature, there is nothing to defer to here because the City has provided no evidence—no testimony, no declaration, no document—on how it set the $63 late fee amount. It is difficult for a moving party to prevail on summary judgment if it has not provided any evidence. And so it is here. Nor should we presume that the City imposed a fairly hefty 100 percent late fee to ensure compliance with the law. If anything, the record undermines any such presumption, as the appellants have offered unrebutted testimony from former City officials that the late fee was established solely to fill up the City's coffers. Given that the $63 late fee appears arbitrary—at least based on the record—we reverse summary judgment for the City and remand.

## BACKGROUND

In Los Angeles, a driver who overstays a parking meter faces a $63 fine. If that driver does not pay within 21 days, the City assesses a 100 percent late payment penalty of another $63. (The City imposes additional late fees—*e.g.*, another $25 late fee if the fine is not paid within 58 days—but those fees are not being challenged here).

The 100 percent late payment penalty traces back to the 1990s.  Between 1996 and 2012, the City implemented multiple across-the-board increases of around $5 each for all parking fines, along with corresponding increases in the 100 percent late penalty.  In 2012, the City Council increased the parking fine and the 100 percent late payment penalty to their current $63 amounts.

The appellants here incurred at least one parking meter citation and late fee.  In 2015, they brought a class action suit against the City of Los Angeles, asserting that the $63 parking fine and $63 late payment penalty violated the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.[1]  The district court granted summary judgment for the City, finding that the $63 initial fine was not "grossly disproportionate" to the offense of overstaying a parking meter and thus did not contravene the Excessive Fines Clause.  In a footnote, the district court rejected the challenge to the $63 late fee but did not explain its rationale.  The appellants appealed.

In *Pimentel I*, we held that the Excessive Fines Clause applies to municipal parking fines.  974 F.3d at 920, 922.  Applying the gross disproportionality analysis set forth in *United States v. Bajakajian*, 524 U.S. 321, 336–40 (1998), we affirmed the district court's summary judgment for the City as to the initial $63 parking fine.  *Pimentel I*, 974 F.3d

---

[1] The complaint also alleged a claim under the Excessive Fines counterpart under the California Constitution, *see* Cal. Const. art. I § 17.  But the opening brief only addresses the claims under the federal Excessive Fines Clause, thus waiving any distinct challenge under the California Constitution.  *See Devereaux v. Abbey,* 263 F.3d 1070, 1079 (9th Cir. 2001) (en banc).  But both parties agreed before the district court that the same standard governs the claims under the federal and state constitutions.

at 922–25.  But we reversed on the late fee, "remand[ing] for the court to determine under *Bajakajian* whether the late payment penalty of $63 is grossly disproportional to the offense of failing to pay the initial fine within 21 days."  *Id.* at 925.

On remand, the appellants argued that the late payment penalty is unconstitutional both facially, and as applied. They adduced some evidence suggesting that the City set its late payment penalty at 100 percent of the parking fine solely to raise revenue.  The City, in contrast, presented no countervailing evidence.  Applying the *Bajakajian* factors, the district court again granted summary judgment for the City.  The appellants timely appealed.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment.  *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021).  "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law."  *Pimentel I*, 974 F.3d at 920 (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc)) (internal quotation marks omitted).

## ANALYSIS

## I.  The Eighth Amendment limits the government's ability to impose excessive punitive fines.

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "The Excessive Fines Clause traces its venerable lineage back to at least 1215,

when Magna Carta guaranteed that '[a] Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement . . . .'" *Timbs v. Indiana*, 586 U.S. 146, 151 (2019) (quoting § 20, 9 Hen. III, ch. 14, in 1 Eng. Stat. at Large 5 (1225)). Magna Carta dictated that "economic sanctions 'be proportioned to the wrong' and 'not be so large as to deprive [an offender] of his livelihood.'" *Id.* (quoting *Browning-Ferris Indus. Of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 271 (1989)).

In the centuries that followed, "authorities abused their power to impose fines against their enemies or to illegitimately raise revenue." *Pimentel I*, 974 F.3d at 921 (citing *Timbs*, 586 U.S. at 162 (Thomas, J., concurring) (discussing the imposition of onerous fines during the reign of the 17th century Stuart kings)). This fear of governmental abuse of power persisted into the colonial era and through the American Founding. *See id.* And so the Framers adopted the Eighth Amendment "to shield the people from governmental overreach." *Id.*; *see also Timbs*, 586 U.S. at 163–67.

Today, the Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense," *Pimentel I,* 974 F.3d at 921 (quoting *Austin v. United States*, 509 U.S. 602, 609–10 (1993)) (internal quotation marks omitted). Only punitive fines fall within the Clause's scope; purely remedial sanctions are not subject to Eighth Amendment scrutiny. *Austin,* 502 U.S. at 609–10; *United States v. Mackby*, 261 F.3d 821, 829–30 (9th Cir. 2001)

The Supreme Court has held that a fine runs afoul of the Eighth Amendment if its amount "is grossly disproportional

to the gravity of the defendant's offense." *Pimentel I*, 974 F.3d at 921 (quoting *Bajakajian*, 524 U.S. at 337). Because neither the text nor the history of the Excessive Fines Clause sheds light on how to assess proportionality, Justice Thomas, writing for the majority in *Bajakajian*, outlined several factors to consider. *Bajakajian*, 524 U.S. at 335 (noting that the "text of the Excessive Fines Clause does not answer [the proportionality question]. Nor does its history"). The four factors for analyzing gross disproportionality are: "(1) the nature and extent of the underlying offense; (2) whether the underlying offense [is] related to other illegal activities; (3) whether other penalties may be imposed for the offense; and (4) the extent of the harm caused by the offense." *Pimentel I*, 974 F.3d at 921 (citing *Bajakajian*). But "*Bajakajian* itself does not mandate the consideration of any rigid set of factors." *Id.*

Even so, one common thread emerges from our Excessive Fines Clause jurisprudence: Our gross disproportionality analysis must be tethered to the nature and extent of the harm suffered by the government. *See, e.g.*, *Bajakajian*, 524 U.S. at 340 (noting the absence of an "articulable correlation to any injury suffered by the Government"); *Vasudeva v. United States*, 214 F.3d 1155, 1161 (9th Cir. 2000) ("trafficking in food stamps is a serious offense that defrauds the federal government and undermines the viability of an important government program for the needy").

Put another way, we do not ask whether a fine appears grossly disproportionate in an abstract sense independent of the harm suffered by the government. *Cf. United States v. $132,245.00 in U.S. Currency*, 764 F.3d 1055, 1061 (9th Cir. 2014) (upholding forfeiture of $132,245 transported by defendant into the United States because his violation of the

bulk cash smuggling statute unlike the reporting statute, "constitute[d] a far greater harm") (citation omitted). So, for example, a $10,000 fine for a minor violation (such as a parking ticket) would be grossly disproportionate. But perhaps such a fine would not violate the Excessive Fines Clause if it implicated serious crimes (say, money-laundering for a drug ring).

In *Pimentel I*, we held that absent "material evidence provided by appellants to the contrary," courts "must afford 'substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments.'" *Pimentel I*, 974 F.3d at 924 (quoting *Bajakajian*, 524 U.S. at 336). We also stressed that the City need not prove "strict proportionality" between the amount of the fine and the gravity of the offense. *Id.* (quoting *Bajakajian*, 524 U.S. at 336). Nor does the City need to commission quantitative analysis to justify its parking fines and late penalties. *Id.*

Applying these principles, we first observed that there was "no real dispute that the City is harmed because overstaying parking meters leads to increased congestion and impedes traffic flow." *Id.* We then held that the City had met the low evidentiary threshold of showing that "the $63 parking fine is sufficiently large enough to deter parking violations but is 'not so large as to be grossly out of proportion' to combatting traffic congestion" in the City. *Id.* (quoting *Towers v. City of Chicago*, 173 F.3d 619, 626 (7th Cir. 1999)).

We now must engage in that same gross disproportionality analysis for the $63 late payment penalty for the parking ticket.

## II.  We reverse summary judgment for the City on the appellants' facial challenge.

Applying the *Bajakajian* factors outlined by the Supreme Court for evaluating Excessive Fines Clause challenges, we hold that a genuine factual dispute remains over the City's basis for the $63 late fee.  We thus reverse the district court's summary judgment for the City and remand.  We stress the narrow scope of our ruling: It is rooted in the evidentiary record—or more accurately, the complete lack of material evidence offered by the City in moving for summary judgment.

### A.  Under the *Bajakajian* factors, we focus mainly on the harm caused by the failure to timely pay parking tickets in determining whether the $63 late fee is "grossly disproportional."

As we explained in *Pimentel I*, the fourth *Bajakajian* factor plays an outsized role here because the first three factors do not strongly favor either party.  But for the sake of completeness, we will briefly address the first three *Bajakajian* factors.

Under the first *Bajakajian* factor, courts assess the nature and extent of the underlying offense by "typically look[ing] to the violator's culpability . . . ."  *Id.* at 922.  The appellants are culpable because they failed to timely pay their parking citations and thus violated Los Angeles Municipal Code § 88.13.  But the offense is minor.  In sum, the appellants' violations are "minimal but not de minimis."  *Pimentel I*, 974 F.3d at 923.

Turning to the second *Bajakajian* factor, we must ascertain whether the underlying offense relates to other illegal activities.  *Id*.  As in *Pimentel I*, this factor—often ill-

suited to the civil context—is neutral because the failure to timely pay the parking fine has no nexus to other illegal activity. *Id.*

The third *Bajakajian* factor—whether alternative penalties may be imposed for the offense—is similarly neutral. *See id.* The appellants do not identify a lesser, alternative penalty that may be imposed but merely assert that the penalty amount could be lower. But as the district court rightly concluded, the appellants "cite no authority supporting their contention that the possibility of a lower late fee is a relevant consideration under *Bajakajian*." Rather, under *Bajakajian*, this court "look[s] to 'other penalties that the Legislature has authorized.'" *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004) (citation omitted). There are no such alternative penalties here, so this factor does not aid our inquiry, either. *See* Cal. Veh. Code § 40203.5(a).

This case thus largely hinges on the fourth *Bajakajian* factor—the extent of the harm caused by the appellants' violation of the law. *See Pimentel I*, 974 F.3d at 923–24. We generally consider both monetary and nonmonetary harms. *See id.* While the "most obvious and simple way to assess this factor is to observe the monetary harm resulting from the violation," we "may also consider how the violation erodes the government's purposes for proscribing the conduct." *Id.* at 923. Here, the monetary harms to the City are fairly obvious: administrative costs to collect the parking fines and the time-value of fees not collected timely.[2] And as for non-monetary harms, the government has an interest

---

[2] Notably though, the City's Fed. R. Civ. P. 30(b)(6) designee testified that the $63 late payment penalty is "not based on interest rate or cost of collection."

in ensuring compliance with the law, even for a matter as seemingly trifling as timely payment of a parking ticket.

## B. We cannot determine "gross disproportionality" as a matter of law because the City offered no evidence to justify its $63 late fee.

After identifying the monetary and non-monetary harms suffered by the City, we must next determine whether a $63 late fee is "grossly disproportional" to the gravity of those harms.  On one end of the spectrum, a nominal $1 late fee would not be "grossly disproportional" to the harms suffered by the City.  On the other end, a $10,000 late fee for a parking ticket would be "grossly disproportional."

The tougher question is whether a 100 percent late fee of $63 for a $63 parking ticket—or, for that matter, a hypothetical late fee of $126 or $200—is "grossly disproportional" to the gravity of nonpayment within 21 days.  To avoid delving into this policy-laden determination, we generally defer to the government's basis for setting fines.  We do not require quantitative studies to justify the fines, nor do we demand strict proportionality.  *Id.* at 924. So long as a government provides an unrebutted commonsense explanation or *some*—even relatively weak— evidence to justify its fine, it will likely prevail against an Excessive Fines Clause challenge.  Our deference is born of a keen awareness that "any judicial determinations regarding the gravity of a particular . . . offense will be inherently imprecise."  *Bajakajian*, 524 U.S. at 336 (citations omitted).

But this deference does not command judicial blindness to the arbitrary imposition of punitive fines.  Here, the City has offered no evidence to justify or explain its $63 late fee. Indeed, the City's Fed. R. Civ. P. 30(b)(6) witness—Robert Andalon, who oversaw the City's parking fines and fees

from 2000 to 2012—testified that he has no clue how the City came up with that amount. To put it bluntly, as far as the City knows, the late fee's $63 amount is arbitrary. And we cannot fall back on reflexive deference to conclude that an arbitrary fine passes constitutional muster.

The City, however, insists that we should defer to the commonsense presumption that a $63 late fee would help ensure compliance with the law. We can, of course, presume that any late penalty will encourage timely payment and compliance. And the city's interest in deterring nonpayment is legitimate. *See Towers*, 173 F.3d at 626. But we must be careful not to conflate the legitimacy of the City's interest in ensuring timely payment with the *proportionality* of the 100 percent late payment penalty. Without evidence establishing an "articulable correlation to any injury suffered by the [City]," *Bajakajian*, 524 U.S. at 340, the City's interest alone does not validate any fine amount that the City might arbitrarily impose. Otherwise, no fine—no matter how sizable or disproportionate—would ever violate the Excessive Fines Clause because the government always has an interest in enforcing its laws.

In any event, we cannot credit the presumption that the City crafted the late fee to ensure compliance—at least at the summary judgment stage in which the City has offered no relevant evidence—because the appellants have provided some material, unrebutted evidence countering that presumption. According to testimony from two former City officials, the late fee was established *solely* to raise revenue and had nothing to do with ensuring compliance with the laws.

Jay Carsman—who oversaw the City's Parking Violations Bureau—rejected the City's assertion that the late

fees were intended to ensure compliance with the law. To the contrary, he claimed that the late fees "were adopted *solely* because the City sought to increase revenue to its General Fund." (Emphasis added). For example, Carsman said that the "$5 increase in 2008 was adopted only two years after the 2006 $5 increase because of the effect of the economic recession on City revenue." And he maintained that the 100 percent late payment penalty "was an arbitrary figure."[3]

The appellants also rely on expert witness Jay Beeber, who in 2014 was appointed by the Mayor to the City's Parking Reform Working Group. Beeber served as co-chair of the group's "Management and Administration" subcommittee, which examined the City's parking enforcement policies and protocols, and, according to Beeber, "conducted extensive research into the history of the City's parking fine and fee structure . . . ." Beeber stated that the working group members had "inquired of the City and the LADOT as to the reason why the initial late payment penalty is 100%," but they "were told that 'it just is what it is,' that is, we were given no reason at all, let alone a rational reason." Beeber also testified that he "ha[s] been unable to locate any City documentation of any reason put forth for a 100% penalty . . . ." He concluded that the "late penalties

---

[3] Carsman's testimony, however, suffers from two evidentiary deficits. First, Carsman retired in January 2008, four years before the late fee was increased to $63. Second, his tenure overseeing the Parking Violations Bureau concluded in 1998. Even so, Carsman attested that he was "involved in evaluating the[] parking fine increases" effected in 1996, 2002, 2006, and 2008. Although Carsman lacks personal knowledge of the City's reason for setting the fine at $63 in 2012, his testimony may potentially bear on the City's basis for fixing the late fee at 100 percent of the fine.

are arbitrary, and that the dollar amounts of their increases over time have been motivated *solely by a desire to increase revenue for the City.*"  (Emphasis added).[4]

To be clear, our Excessive Fines Clause precedent does not establish that revenue-raising is an inherently improper aim that renders a fine grossly disproportionate.  By definition, all civil penalties and criminal fines serve a revenue-raising function.  *See Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 778 (1994).  The City is, of course, entitled to rely on the revenue generated by parking fines and penalties, even for services unrelated to parking enforcement.  By the same token, however, the Supreme Court has also suggested that "it makes sense to scrutinize governmental action more closely when the State stands to benefit."  *Timbs*, 586 U.S. at 154 (quoting *Harmelin* v. *Michigan*, 501 U.S. 957, 979 n.9 (1991) (opinion of Scalia, J.)) (internal quotation marks omitted).  Thus, if revenue generation were the *sole* basis for the 100 percent late payment penalty, then the nexus between the amount of the late fee and the gravity of the underlying offense becomes all the more tenuous.  Put another way, revenue generation alone says nothing about the harm suffered by the government—and thus has no bearing on the proportionality of a fine under the fourth *Bajakajian* factor.  The late payment penalty must "bear some relationship to the gravity of the offense that it is designed to punish," but the aim of revenue generation does not render a fine *per se* excessive.  *Bajakajian*, 524 U.S. at 334.

Here, the City has not met its low burden of showing that a 100 percent late payment penalty of $63—a not

---

[4] The district court did not rule on the City's evidentiary objections to the testimony of Beeber and Carsman, so we do not address them here.

insubstantial amount—"is sufficiently large enough to" ensure timely payment "but is 'not so large as to be grossly out of proportion'" to the offense of nonpayment within 21 days. *See Pimentel I*, 974 F.3d at 924 (quoting *Towers*, 173 F.3d at 626). [5]  The City has provided no evidence to explain its late fee.  And in the face of countervailing and unrebutted

---

[5] The dissent argues that the majority opinion incorrectly bases the excessiveness inquiry on the proportionality between the late fee and the original parking fine.  Dissent at 37 (citing Op. at 5); *id.* at 37–38 & n.10. Not so.  First, we explicitly state: "[T]he City has not met its low burden of showing that a 100 percent late payment penalty of $63—a not insubstantial amount—'is sufficiently large enough to' ensure timely payment 'but *is 'not so large as to be grossly out of proportion'' to the offense of nonpayment within 21 days*."  Op. at 17 (citation omitted) (emphasis added).  That sentence makes clear that we are comparing the late fee amount to the harm caused by the offense of not paying the parking ticket timely.

Nonetheless, the dissent stresses that it "does not matter whether the late fee is 10 percent or 100 percent of the original parking fee" because the "relevant question is whether the $63 late fee is grossly disproportionate to *the harms caused by nonpayment*."  Dissent at 38 (emphasis in original).  Again, we agree that the relevant inquiry is not whether the late fee is proportional to the initial parking fine—and we imply nothing to the contrary merely by observing that the late penalty is 100 percent of the initial fine.

But we note that the ratio of the late payment penalty to the initial fine is still relevant to our factbound inquiry in this case, given the testimony from City officials about the history of the parking fees.  On these facts, relevant to determining whether the $63 late penalty is grossly disproportional to the offense of nonpayment is whether the penalty was arbitrarily set at 100 percent in the 1990s and then merely increased dollar-for-dollar, along with the initial fine, to $63 in 2012—without any relationship to the harm caused by nonpayment.  It is simply for this reason—assessing whether the fine was arbitrarily both imposed and increased without regard for the harm—that we reference the ratio between the late penalty and the initial parking fine.

evidence from the appellants, the City cannot rely on a general presumption that its late fee was adopted to ensure timely compliance with its laws.

The dissent accuses the majority of focusing on the City's motivation for setting the late payment penalty. Dissent at 30–33. By engaging in a "motivation inquiry," the dissent insists, the court "injects itself into the legislative process and creates a requirement that courts parse a legislative body's motive in implementing a fine . . . ." Dissent at 30.

We do no such thing. Our holding hinges on the lack of *evidence* supporting the City's asserted rationale for setting the late payment penalty at $63 in 2012. The City moved for summary judgment, so we must look at the evidence offered by the parties. While we are deferential to the City's decisions, there is nothing we can defer to because the City has provided no evidence about why or how it set the $63 late fee. Had the City provided *something*—testimony from a Rule 30(b)(6) witness, a declaration from a City official, or even a single piece of paper shedding light on the City's basis for the $63 late fee amount—the City would have likely prevailed. But the City provided zilch.

Reflexive deference is inappropriate where, as here, the City "stands to benefit," *Harmelin*, 501 U.S. at 978 n.9, and has failed to offer any evidence that the late payment penalty was—as the City claims—set at an amount that would ensure compliance and deter both monetary and nonmonetary harm. The City's assertions in its briefing are not evidence and do not support the substantial deference it seeks (and would otherwise be entitled to). *See Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015) ("arguments in briefs are not evidence"). We simply ask that the City

provide _some_ evidence that the penalty amount was actually tethered to the nature and extent of the harm caused by nonpayment.[6]  This commonsense approach does not require parsing the motives of legislatures.  _Contra_ Dissent at 31.  It just requires the government to provide some evidence that the fine amount was not wholly arbitrary.

In sum, our decision is based on the City's inability to adduce any evidence that its late fee was not arbitrarily imposed, not on improper judicial scrutiny of legislative motives.  This is a low evidentiary bar, not—as the dissent erroneously claims—a searching inquiry demanding from municipal officials "evidence of why the City chose $63 and not $62."[7]  Dissent at 31.  And under the specific facts here, the City has not met that low bar.  We thus reverse the district court's summary judgment for the City on the appellants' facial challenge.

---

[6] We mention the two former high-ranking City officials—who swore under oath that the City enacted the late fee solely to generate revenue—merely to point out that the City cannot rely on a presumption that its late fee is tied to the extent of harm it suffered when (1) it has offered no evidence to support that assertion, (2) it has not even tried to rebut the evidence offered by the plaintiffs, and (3) the late fee amount is not insignificant.

[7] The dissent seems to rely on the most extreme, rubber-stamp version of rational basis review in which we uphold a fine as long as we can divine a conceivable basis for it, even if the legislature never articulated that purpose and lacks any knowledge of how it came up with the fine amount. But rational basis review largely applies to governmental action where fundamental rights or suspect classifications are not implicated. In contrast, our Constitutional safeguard against excessive fines "has been a constant shield throughout Anglo-American history," _Timbs_, 586 U.S. at 149, 153.

### III. We decline to incorporate means-testing into our Excessive Fines Clause analysis.

The appellants also mount an as-applied challenge, asserting that several of them lack the financial means to pay the fine within 21 days.  They reprise their argument from their prior appeal that the Excessive Fines Clause analysis should incorporate means-testing by evaluating a person's ability to pay.  *See also Pimentel I*, 974 F.3d at 924–25.

As noted in *Pimentel I*, the Supreme Court declined to address whether an ability to pay is relevant to the Excessive Fines Clause analysis.  *Id.* at 925 (citing *Bajakajian*, 524 U.S. at 340 n.15).  We, too, once again decline to incorporate a means-testing requirement for claims arising under the Excessive Fines Clause.  *Id.*

The appellants mainly rely on *United States v. Real Prop. Located in El Dorado Cnty.*, 59 F.3d 974, 985 (9th Cir. 1995), *abrogated in part on other grounds by Bajakajian*, 524 U.S. 321 (1998), a pre-*Bajakajian* decision about an *in rem* forfeiture.  *El Dorado* commanded consideration of "the hardship to the defendant, including the effect of the forfeiture on defendant's family or financial condition," as part of the court's analysis of the "harshness of the forfeiture" under the Eighth Amendment.  *Id.*  But the appellants have cited no case law extending *El Dorado* beyond the confines of *in rem* forfeitures, let alone to civil *in personam* fines.  *See United States v. Dubose*, 146 F.3d 1141, 1146 (9th Cir. 1998), *as amended on denial of reh'g* (Aug. 31, 1998) (refusing to extend *El Dorado* to the context of criminal restitution and noting that "an Eighth Amendment gross disproportionality analysis does not require an inquiry into the hardship the sanction may work on the offender").

Finally, the appellants' emphasis on the origins of the Excessive Fines Clause is similarly unpersuasive. The Excessive Fines Clause reflects the principle that a fine "should not deprive a wrongdoer of his livelihood." *Bajakajian,* 524 U.S. at 335; *see also Browning-Ferris,* 492 U.S. at 269. But for criminal forfeitures, our sister circuits have noted that a deprivation of livelihood is distinct from a present inability to pay. *See, e.g., United States v. Viloski*, 814 F.3d 104, 112 (2d Cir. 2016) ("whether a forfeiture would destroy a defendant's *future* livelihood is different from considering as a discrete factor a defendant's *present* personal circumstances, including age, health, and financial situation" (emphasis in original)).

\* \* \*

Today, we reaffirm that the "right to be free from excessive governmental fines is not a relic relegated to the period of parchments and parliaments, but rather it remains a crucial bulwark against government abuse." *Pimentel I*, 974 F.3d at 925. As the Supreme Court recognized, the Excessive Fines Clause is "fundamental to our scheme of ordered liberty with deep roots in our history and tradition." *Timbs*, 586 U.S. at 149 (internal quotation marks and alterations omitted).

The dissent, however, dismissively claims that applying the Clause to the $63 late penalty somehow "trivializes the monumental import of the documents from which the Clause sprung—Magna Carta, the English Bill of Rights, and the Virginia Declaration of Rights." Dissent at 41. But our Constitution protects against arbitrary governmental overreach, no matter how slight the government contends that its incursions are. *Cf. Off. of United States Tr. v. John Q. Hammons Fall 2006, LLC*, 144 S. Ct. 1588, 1612 (2024)

(Gorsuch, J., dissenting) (rejecting view that "supplying relief isn't worth the trouble because the constitutional violation at issue here was . . . 'short-lived and small'"). And so we have rightly checked the government's transgressions—even where the government contends that its violations were minor—in other realms of constitutional rights, such as free speech and free exercise.[8] Far from trivializing the Clause's "venerable lineage," *Timbs*, 586 U.S. at 151, our decision reflects the Founders' fear of governmental abuse through arbitrary fines and thus is consistent with the original meaning of the Eighth Amendment.

In short, while we remain deferential to the legislature's authority to fashion punitive fines, our Eighth Amendment jurisprudence does not allow imposing arbitrary sanctions. We stress that our holding is a narrow one: Based on the record before us at the summary judgment stage, we cannot conclude as a matter of law that the City's late payment penalty is not unconstitutionally excessive.

---

[8] *See, e.g.*, *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) ("[T]his court and the Supreme Court have repeatedly held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (applying same standard in free exercise context); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001) ("There is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification."); *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 977 (9th Cir. 2002) ("The denial of even a 'trivial' benefit may form the basis for a First Amendment claim where the aim is to punish protected speech.").

## CONCLUSION

We **REVERSE** the district court's grant of summary judgment in the City's favor and **REMAND** for further proceedings consistent with this opinion.

---

BENNETT, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court did not err in rejecting Plaintiffs' as-applied challenge. But because the Excessive Fines Clause does not prohibit imposing the $63 late-fee penalty, I respectfully dissent.

## I. The majority's opinion runs counter to the history of the Eighth Amendment.

In early England, "[t]he amount of an amercement was set arbitrarily, according to the extent to which the King or his officers chose to relax the forfeiture of all the offender's goods." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 288 (1989) (O'Connor, J., concurring in part and dissenting in part) (internal quotation marks omitted). Fines replaced imprisonment, but the amount of the fine bore no relation to the offense, rather it depended on the benevolence, or lack thereof, of the King. 2 F. Pollock & F. Maitland, The History of English Law 512–16 (2d ed. 1899). But after years of monarchs abusing power and under threat of civil war, King John agreed to Magna Carta, which placed limits on royal authority and its place above the law. The Excessive Fines Clause springs from Magna Carta's guarantee that "[a] Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him

his contenement." § 20, 9 Hen. III, ch. 14, in 1 Eng. Stat. at Large 5 (1225). Magna Carta required economic sanctions "be proportioned to the wrong" and "not be so large as to deprive [an offender] of his livelihood." *Browning-Ferris*, 492 U.S. at 271.

Although Magna Carta created a proportionality requirement, excessive fines persisted and became most prevalent in the 17th century during the reign of the Stuart kings. *See Timbs v. Indiana*, 586 U.S. 146, 152 (2019) (citing The Grand Remonstrance ¶¶ 17, 34 (1641), in The Constitutional Documents of the Puritan Revolution 1625–1660, pp. 210, 212 (S. Gardiner ed., 3d ed. Rev. 1906)); *Browning-Ferris*, 492 U.S. at 267. In seeking to reaffirm Magna Carta's guarantee, the post-Glorious Revolution English Bill of Rights provided that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted." 1 Wm. & Mary, ch. 2, § 10, in 3 Eng. Stat. at Large 441 (1689).

As the Supreme Court has recognized, "it is clear that the Eighth Amendment was 'based directly on Art. I, § 9, of the Virginia Declaration of Rights,' which 'adopted verbatim the language of the English Bill of Rights.'" *Browning-Ferris*, 492 U.S. at 266 (quoting *Solem v. Helm*, 463 U.S. 277, 285 n.10 (1983)). In 1787, the constitutions of eight states prohibited excessive fines, but only three at the time of the founding mandated that penalties be proportionate to the crimes for which they were imposed. Steven G. Calabresi, Sarah E. Agudo & Kathryn L. Dore, *State Bills of Rights in 1787 and 1791: What Individual Rights are Really Deeply Rooted in American History and Tradition?*, 85 S. Cal. L. Rev. 1451, 1517, 1519 (2012). When the Fourteenth Amendment was ratified in 1868, thirty-five states had excessive fines clauses in their state constitutions, but only

nine required fines be proportionate to the offensive conduct. Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights are Deeply Rooted in American History and Tradition*, 87 Tex. L. Rev. 7, 82–83 (2008).

The Supreme Court's jurisprudence on the Excessive Fines Clause has taken a similarly winding path.  In 1833, the Supreme Court concluded that, even if "the excess of the fine were apparent on the record," there was no appellate jurisdiction to reverse a sentence from a lower court that imposed such an excessive fine.  *Ex parte Watkins*, 32 U.S. 568, 574 (1833).  For much of the 19th and early 20th centuries, discussion about the Excessive Fines Clause found a home in concurrences, dissents, and general dicta, and not as a dispositive topic in a majority opinion.  *See, e.g.*, *Pervear v. Massachusetts*, 72 U.S. 475, 479–80 (1866) (noting that the Eighth Amendment did not apply to states, but if it did, a fine of $50 and three months' imprisonment for operating an unlicensed liquor store would not be excessive);[1] *Waters-Pierce Oil Co. v. Texas*, 212 U.S. 86, 111–12 (1909) (assuming without deciding that an excessive fine, even if definite, would violate the Eighth Amendment but that the Eighth Amendment did not "operate[] to control the legislation of the states," so the Court could only act if the fine was "so grossly excessive as to amount to a deprivation of property without due process of law"); *United States ex rel. Milwaukee Soc. Democratic Publ'g. Co. v. Burleson*, 255 U.S. 407, 435 (1921) (Brandeis, J., dissenting)

---

[1] The Eighth Amendment's Excessive Fines Clause has since been incorporated by the Due Process Clause of the Fourteenth Amendment. *Timbs v. Indiana*, 586 U.S. 146, 150 (2019).

(reasoning that the denial of certain mailing privileges which imposed daily-increasing costs on a newspaper could violate the Eighth Amendment as an "unusual" and "unprecedented" fine).  In the 1970s, when the Court was presented with the issue of fines levied against the indigent, which resulted in imprisonment if the individual could not pay, the excessiveness of such fines was not addressed.  Instead, the Court evaluated the claim as a violation of the Equal Protection Clause.  *See Williams v. Illinois*, 399 U.S. 235, 238 (1970); *Tate v. Short*, 401 U.S. 395, 398 (1971).  Around the early 1990s, the Supreme Court addressed the application of the Excessive Fines Clause to civil jury awards of punitive damages, *see Browning-Ferris*, 492 U.S. at 280, and to civil forfeitures of a punitive nature, *see Austin v. United States*, 509 U.S. 602, 604 (1993), but did not address what makes a fine "excessive."

It was not until *United States v. Bajakajian*, 524 U.S. 321 (1998), that the Supreme Court adopted Magna Carta's proportionality and explained what renders a fine excessive: "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear *some* relationship to the gravity of the offense that it is designed to punish."  *Id.* at 334 (emphasis added).  Still, the Court faced the difficult question of "just how proportional to a[n] . . . offense a fine must be, and the text of the Excessive Fines Clause does not answer it.  Nor does its history."  *Id.* at 335.  The Excessive Fines Clause "was little discussed in the First Congress and the debates over the ratification of the Bill of Rights."  *Id.*  Neither Magna Carta nor the English Bill of Rights, from which "the Clause was taken verbatim," answers the question of how to evaluate the proportionality of a particular civil fine.  *Id.*

Instead, the Supreme Court looked to "other considerations in deriving a constitutional excessiveness standard." *Id.* at 336. In prescribing the factors courts must consider in evaluating excessiveness and proportionality, the Supreme Court identified two relevant controlling principles. Turning first to the Court's Cruel and Unusual Punishments Clause jurisprudence, the Supreme Court explained "that judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* (citing *Solem v. Helm*, 463 U.S. 277, 290 (1983) ("Reviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes")). The second consideration that guided the Supreme Court in establishing an excessiveness standard "is that any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise." *Id.* As these two principles "counsel against requiring strict proportionality," the Supreme Court "adopt[ed] the standard of gross disproportionality articulated in [its] Cruel and Unusual Punishments Clause precedents." *Id.*[2] To carry out these principles and determine whether a fine is disproportional to the gravity of the defendant's offense, we look to four factors: "(1) the nature and extent of the underlying offense; (2) whether the underlying offense related to other illegal activities; (3) whether other penalties may be imposed for the offense; and (4) the extent of the harm caused by the offense." *Pimentel v. City of Los Angeles* (*Pimentel I*), 974 F.3d 917, 921 (9th Cir. 2020).

---

[2] *Bajakajian* and these guiding principles still control. *See United States v. $132,245.00 in U.S. Currency*, 764 F.3d 1055, 1057–58 (9th Cir. 2014).

The majority errs by failing to abide by these principles, and in doing so, holds governments to a standard found neither in the precedent of the Supreme Court, our court, nor in the history of the Eighth Amendment.  The majority neither gives legislative bodies the substantial deference that they are owed, nor does it adequately address how, even viewing *all* facts in Plaintiffs' favor, a $63 fine *could* be grossly disproportionate—especially in light of Plaintiffs' own expert testifying that *some* fine was appropriate and that even a $25 fine would be proportional.

## II.  Legislative bodies are owed substantial deference, which the majority improperly dismisses.

In *Pimentel I*, we found that the City's initial $63 fine for overstaying the allotted time at a parking meter was "not grossly disproportionate to the offense and thus survives constitutional scrutiny."  974 F.3d at 920.  As to the fourth *Bajakajian* factor, which predominates here, we explained:

> there is no real dispute that the City is harmed because overstaying parking meters leads to increased congestion and impedes traffic flow.  Without material evidence provided by [Plaintiffs] to the contrary, we must afford "substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments."

*Id.* at 924 (quoting *Bajakajian*, 524 U.S. at 336).

Indeed, we presume city ordinances serve a legitimate interest unless a party plausibly alleges otherwise. *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452 (9th

Cir. 2019); *see Towers v. City of Chicago*, 173 F.3d 619, 625–26 (7th Cir. 1999) (deferring to the city and concluding that a $500 fine was not excessive when the city "was entitled to take into consideration that the ordinances [imposing an administrative penalty to the owner of any vehicle containing illegal drugs or unregistered firearms] must perform a deterrent function"). Because the Supreme Court had noted the importance of the deference afforded to legislatures in fashioning fines, we held that the Eighth Amendment did not obligate "the City to commission quantitative analysis to justify the $63 parking fine amount," because "[t]hat amount bears 'some relationship' to the gravity of the offense," and "[w]hile a parking violation is not a serious offense, the fine is not so large, either, and likely deters violations." *Pimentel I*, 974 F.3d at 924. In short, in *Pimentel I* we adhered to the substantial deference owed to the City.

But here, the majority departs from that principle. The majority recognizes the harms that the City seeks to address through the late fee:

> [T]he monetary harms to the City are fairly obvious: administrative costs to collect the parking fines and the time-value of fees not collected timely. And as for non-monetary harms, the government has an interest in ensuring compliance with the law, even for a matter as seemingly trifling as timely payment of a parking ticket.

Maj. at 12 (footnote omitted). It is therefore undisputed that the nonpayment of parking fines harms the City, and thus the

City is owed "substantial deference" in determining the appropriate punishment. *Bajakajian*, 524 U.S. at 336.

Despite recognizing the City's interest in the fine as addressing both monetary and non-monetary harms, the majority agrees with Plaintiffs, who have manufactured a factual dispute about the deterrent effect of the late fee by arguing that the City produced no evidence that the late fee had any deterrent effect on future parking meter violations or encouraged compliance.

But as we recognized in *Pimentel I*, and as the district court correctly recognized on remand, the City need not show "strict proportionality" between the fine amount and the seriousness of the offense, and it is well-established that monetary penalties provide a deterrent to unlawful conduct.

The majority also agrees with Plaintiffs' primary argument that the City's motive behind the late fee is to generate revenue, which supposedly per se renders the late fee excessive, or at the very least, provides a supposed disputed issue of material fact, thus precluding summary judgment. But by adopting this view, the majority injects itself into the legislative process and creates a requirement that courts parse a legislative body's motive in implementing a fine, including through holding a trial to determine such motive.

The majority's creation of this motivation inquiry begs several questions, not least of which is how a party or a court is to discern the legislative motive. Are we to look to the mayor who is the executive of the City but has no control over the amount of the late fee? Do we look to a majority of the City Council who vote for a particular late fee? Do we look to the City employees who explain the thought behind the late fee, but not necessarily why the City adopted it? The

majority's unsupported focus on the "motivation" behind a fine improperly requires legislative bodies (at least in some circumstances)[3] to make specific findings on why they enact a certain fine, lest they be accused, as the City is here, of failing to provide sufficient evidence of why the City chose $63 and not $62.[4]

What is the extent of the burden the majority now places on legislative bodies?  Must they show that the fine is rationally related to a legitimate government interest akin to rational basis review?  Or does the majority hold legislative bodies to a higher standard of showing the fee is substantially related to furthering an important government interest akin to intermediate scrutiny?  *Bajakajian* requires only that the amount of the forfeiture "bear *some*

---

[3] And if such findings are required for a $63 parking late fee, one can imagine a similar requirement for scores of what would have here-to-fore been thought to be routine fine settings.  And so, scores of potential future federal court § 1983 actions and class actions.

[4] The majority contradicts itself.  In response to the questions I raise in this dissent concerning the majority's motivation inquiry, the majority attempts to cabin its holding "on the lack of *evidence* supporting the City's asserted rationale for setting the late payment penalty at $63 in 2012." Maj. at 18.  But even the majority is unclear about what the City could have done to meet its burden under the majority's new standard.  In the majority's view, even had the City provided "testimony from a Rule 30(b)(6) witness, a declaration from a City official, or even a single piece of paper shedding light on the City's basis for the $63 late fee amount" it "would have *likely* prevailed." *Id.* (emphasis added).  Even were the City to come forward with a declaration from a City official stating "we have evaluated the proportionality of the late fee and have set it at $63, which is sufficiently large to ensure timely payment but not so large as to be grossly disproportionate to the harm of untimely payment," the majority *still* leaves open the door that a litigant could invent a factual dispute requiring resolution from a jury about the City's motivation.

*relationship* to the gravity of the offense."  524 U.S. at 334 (emphasis added).  *Bajakajian* does not require that a legislative body affirmatively prove to a trier of fact that it was not motivated by revenue generation in implementing a fine.  Dictating what a legislative body must say and do, when the Supreme Court has advised courts to afford "substantial deference" to that legislative body, is a stark overstep of the judiciary's role and improperly encroaches on the legislative body's ability to do its job.**[5]**

---

[5] The majority claims I "rely on the most extreme, rubber-stamp version of rational basis review in which we uphold a fine as long as we can divine a conceivable basis for it, even if the legislature never articulated that purpose and lacks any knowledge of how it came up with the fine amount."  Maj. at 19 n.7.

First, at no point in this dissent do I argue that rational basis review should apply.  I mention the levels of scrutiny here because the majority's motivation inquiry seemingly *raises* the bar that legislative bodies must meet to justify the proportionality of a fine but does not clarify just how high that new threshold is.

Second, the existing low threshold a legislative body must meet comes not from my dissent, but from the Supreme Court and our precedent. *Bajakajian*, 524 U.S. at 336; *Pimentel I*, 974 F.3d at 924; *Rosenblatt*, 940 F.3d at 452.  "Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes . . . ." *Solem v. Helm*, 463 U.S. 277, 290 (1983).  The only question before us is whether the amount of the forfeiture "bear[s] *some* relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334 (emphasis added).  The majority cites no authority that imposes a more demanding standard or allows us to question the legislature's motive when it provides evidence justifying the late fee.

Finally, the majority claims that its holding is an evidentiary one, and not one that seeks to interrogate the legislature's motivation in implementing a fine.  But strangely, at the same time the majority is

Similarly, even were it appropriate to look at the City's motivation behind the fine, the majority cannot rest its reasoning on the proposition that the City's late fee is excessive because its purpose is to generate revenue. First, neither the majority nor Plaintiffs point to any authority for the proposition that a legislature's imposition of a fine to generate revenue renders the fine disproportionate to the underlying offense. Indeed, as the majority recognizes, "our Excessive Fines Clause precedent does not establish that revenue-raising is an inherently improper aim that renders a fine grossly disproportionate." Maj. at 16. But the majority creates such a standard by holding that "if revenue generation were the *sole* basis for the 100 percent late payment penalty, then the nexus between the amount of the late fee and the gravity of the underlying offense becomes all the more tenuous."[6] *Id*.

---

saying it is *not* intending to interrogate the legislature as to motive, it is still focusing on the supposed flaw of relying on reasons "the legislature never articulated." Maj. at 19 n.7. Despite its claim to the contrary, the majority *still* improperly believes that a legislature must sufficiently articulate to the majority's liking its purpose for passing every fine. If the legislature fails to preemptively meet the majority's indeterminate motivation standard, then it must prove its motivation to a jury. The separation of powers concerns underlying *Bajakajian* are even more prominent here, where the majority deems itself the arbiter of legitimate legislative motivations.

[6] On this point, even the Plaintiffs disagree with the majority's motivation inquiry. When asked at oral argument whether a $10 fee that was created entirely for the purpose of revenue generation would violate the Eighth Amendment, Plaintiffs answered, "It is clear that a late penalty fee has some relationship to the loss of money for a period of time. So a $10 fee, given the discretion that is afforded to municipalities

Even if *one* of the City's motivations were to raise revenue, that would not render the fine excessive given other legitimate motivations to mitigate "fairly obvious" harms. The majority does not explain how, even if revenue generation were an illegitimate purpose (and it isn't), it would negate the other legitimate purposes the City had in implementing the late fee. The majority does not point to a similar case in which revenue generation was found to be such an illegitimate purpose that it tainted *any* other purpose in implementing a fine or fee.

But even moving beyond that flaw, fines, of course, generate revenue, and have always done so. "Criminal fines, civil penalties, civil forfeitures, and taxes all share certain features: They generate government revenues, impose fiscal burdens on individuals, and deter certain behavior." *Montana v. Kurth Ranch*, 511 U.S. 767, 778 (1994). Revenue generation is an inherent characteristic of fines, not a constitutional flaw.[7]

---

under the Eighth Amendment jurisprudence . . . I doubt there would be much of a challenge to that." Oral Arg. at 5:57–6:35.

Moreover, the majority's statement characterizes the proportionality issue as between the late fee and the original payment, and in doing so, the majority discards the very harms it earlier described as "fairly obvious."

[7] To that extent, every fine benefits the government that receives revenue from its enforcement. Relying on a statement in a footnote from a portion of Justice Scalia's opinion in *Harmelin v. Michigan*, 501 U.S. 957, 978 n.9 (1991) that was joined only by Chief Justice Rehnquist, the majority argues the fact that the City benefits from the fine makes "[r]eflexive deference [] inappropriate" here, especially as the City "has failed to offer any evidence that the late payment penalty was . . . set at an amount that would ensure compliance and deter both monetary and

nonmonetary harm." Maj. at 18. The majority also states: "[t]he City has provided no evidence to explain its late fee." Maj. at 17. The majority's view comes with both a legal and factual error.

First, the majority is wrong in choosing to rely on a statement in *Harmelin* from two Justices (who dissented in *Bajakajian*), over *Bajakajian*'s deference standard. In *Harmelin*, Justice Scalia stated that "it makes sense to scrutinize governmental action more closely when the State stands to benefit." 501 U.S. at 978 n.9. But seven years later, in *Bajakajian*, the Court adopted the Cruel and Unusual Punishments Clause standard of gross disproportionality to the Excessive Fines Clause and emphasized the deference owed to legislative bodies. 524 U.S. at 334–36. If the majority were correct that we should defer less to the legislative body when government benefits, we would have to reject *Bajakajian*'s deference standard every time we evaluate a fine, because all fines generate revenue. That neither the majority opinion nor the dissent in *Bajakajian* even cite *Harmelin* is telling.

Factually, the majority either fails to evaluate evidence appropriately, or ignores evidence. We start with this standard: "Without material evidence provided by appellants to the contrary, we must afford 'substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments." *Pimentel I*, 974 F.3d at 924 (quoting *Bajakajian*, 524 U.S. at 336). The majority cites to two individuals and their testimony about the late fee. First, the majority points to Jay Carsman, who had been retired from the City for four years before the late fee of $63 was even implemented. Carsman testified that the late fees "were adopted solely because the City sought to increase revenue to its General Fund." As the majority recognizes, Carsman "lacks personal knowledge of the City's reason for setting the fine at $63," Maj. at 15 n.3, and Carsman's testimony does not undercut the evidence the City produced that I later discuss, including City Controller Ron Galperin's letter that explained that the late fee was directly tied to the City's financial ability to conduct its parking program. As I also later note, the majority does not even discuss the Galperin letter.

The majority also points to Plaintiffs' expert, Jay Beeber, who stated broadly that he was "given no reason at all, let alone a rational reason," as to why the City set the late fine at $63. Maj. at 15. Again, this is not

Further, even under the majority's flawed view—assuming a trier of fact could somehow determine the motivation of a multi-person legislative body, and assuming the legislative body's motivation could be both determinable and dispositive[8]—no reasonable jury could conclude that the revenue raising potential was the *sole* purpose behind the late fee.

Courts presume that city ordinances serve the city's legitimate interests, and it is the plaintiff's burden to rebut that presumption. *Rosenblatt*, 940 F.3d at 452. As we explained, "legislatures . . . retain broad authority to fashion fines" and the government need not show "strict proportionality" between the fine amount and the gravity of the underlying offense. *Pimentel I*, 974 F.3d at 924 (internal quotation marks and citation omitted). Plaintiffs have failed

---

contrary to Galperin's letter, it merely establishes that Beeber did not know the justifications for the late fine. Accordingly, it is not the City that has produced no evidence, rather it is Plaintiffs who have failed to do so. And again, as we said in *Pimentel I*, the Plaintiffs' failure to produce material evidence contradicting the evidence put forth by the City means "we *must* afford substantial deference" to the City. 974 F.3d at 924 (emphasis added) (quotation mark omitted) (quoting *Bajakajian*, 524 U.S. at 336).

[8] I believe this inquiry is a non-sequitur on many levels, the most basic one being that the inquiry doesn't remotely inform whether the fine is grossly disproportional to the harm. Every council member could have voted for a $1,000 late fee for a $63 parking ticket solely to deter the harms caused by late payment and nonpayment of the $63. But that wouldn't make the grossly disproportional $1,000 penalty constitutional. Similarly, every council member could have voted to impose a $25 late fee solely to raise revenue. That wouldn't render the obviously constitutional fee unconstitutional. We look to the excessiveness of a fine by evaluating the proportionality of the amount to the offense, not the "motivation."

to meet their burden to overcome the presumption afforded to the City, even accepting the majority's flawed test.

### III. The City met its "low burden" of showing the late fee is not disproportionate to the harm caused by untimely payment.

To evaluate the fourth *Bajakajian* factor, we look to "the monetary harm resulting from the violation," and "how the violation erodes the government's purposes for proscribing the conduct." *Pimentel I*, 974 F.3d at 923.

The proportionality of the City's late fee is informed by two legitimate purposes. First, the City explained how the $63 late fee protects it from substantial monetary harm. When taken in the aggregate, as we evaluated the initial $63 fine in *Pimentel I*, the City's cost to collect the initial fine would be heightened if every driver or many drivers failed to timely pay the initial fine. Before the district court, Plaintiffs argued that this monetary harm was "negligible," because the negative impact "amount[s] to nothing more than mailing another late notice." They renew this argument on appeal, arguing failure to pay the original parking fine within 21 days "imposes at most a negligible monetary cost" which is the "equivalent of a tiny amount of interest on the owed amounts after 21 days."

The majority looks at the proportional increase between the original parking fee and the late fee and holds that there is a factual dispute "about the City's basis for setting the late fee at 100 percent of the parking fine." Maj. at 5. Respectfully, the inquiry is not whether the late fee is proportional to the original fee. It simply does not matter whether the late fee is 10 percent or 100 percent of the

original parking fee.[9]  The relevant question is whether the $63 late fee is grossly disproportionate to *the harms caused by nonpayment*. In *Pimentel I*, we found the same fine amount of $63 to be constitutional under the Excessive Fines Clause.  974 F.3d at 923–24.  The late fee mitigates both the monetary harms that flowed from the original parking violation, as well as new ones, such as untimely or nonexistent payments of the original fine.  Following our analysis in *Pimentel I*, I would find that the $63 late fee is easily    proportional    (and    certainly    not    grossly disproportional) to the recognized (and obvious) harms that flow from late payment of the original parking fine.

---

[9] The majority claims it is "comparing the late fee amount to the harm caused by the offense of not paying the parking ticket timely," and not to the proportionality between the late fee and the original parking fine. Maj. at 17 n.5.  It is odd, then, that the majority continues to frame the issue before us as relating to "the City's basis for setting the late fee at *100 percent of the parking fine*."  Maj. at 5 (emphasis added); *see id.* ("Nor should we presume that the City imposed a fairly hefty 100 percent late fee to ensure compliance with the law."); *id.* at 6 ("The 100 percent late payment penalty traces back to the 1990s. . . . [T]he City implemented . . . increases . . . for all parking fines . . . [including] the 100 percent late penalty. . . . [T]he City Council increased the parking fine and the 100 percent late payment penalty . . . ."); *id.* at 7 (Plaintiffs "adduced some evidence suggesting that the City set its late payment penalty at 100 percent of the parking fine solely to raise revenue."); *id.* at 13 ("The tougher question is whether a 100 percent late fee of $63 for a $63 parking ticket . . . is 'grossly disproportional' to the gravity of nonpayment within 21 days."); *id.* at 15, n. 3 ("Although Carsman lacks personal knowledge . . . his testimony may potentially bear on the City's basis for fixing the late fee at 100 percent of the fine."); *see also id.* at 16.  The percentage increase for the fine does not relate to any of the four *Bajakajian* factors.   But the majority mentions the proportionality between the fine and late fee 17 times in its 23-page opinion, even though the majority says it is *not* focusing on this proportionality.

Creating, implementing, and enforcing a parking system the way the City believes will work best is an important interest.  The harm in our overturning that system (or at least requiring a trial in the most routine circumstances) is readily apparent.  In 2017, Ron Galperin, the City Controller, wrote a letter to the mayor and city council to discuss "Parking Citations and Revenue."  After analyzing the City's citation program, Galperin found that "the City generated close to $148 million in gross ticket revenues in FY 2015–16, but some [75 percent] of ticket revenue went to overhead, salaries and administrative costs" of operating the City's Department of Transportation Citation Program.  He advised that "[t]he remaining $41 million was available and used to help pay for City services through the General Fund," and he recommended the mayor and city council "act with caution when considering the reduction in parking fines."  Therefore, by 2017, the "negligible" harm directly related to the City's ability to pay over $100 million in administrative costs.

Plaintiffs argue that this letter shows the City's intent was purely financial, because the City relied on revenue from parking fines and the late fee.  But three-quarters of the fee generation went to administrative costs to implement and enforce the parking fines throughout the City.  There are also administrative costs associated with enforcing the late fee itself, including tracking drivers who have failed to pay the late fee, notifying drivers of the late fee and, absent payment after the notification, sending the driver's information to a third-party contractor for more collection efforts. The size of the administrative costs alone reinforces the City's legitimate financial interest in the timely payment of parking fines—an interest which is directly supported by the late fee

here.[10]    With three-quarters of the entire parking fine administrative scheme being supported by the funds received from the fees, if even a small portion of those fines are untimely paid, the City endures a significant harm of not being able to adequately fund its administrative scheme or being forced to take funds from one source to supplement the parking fine administration while waiting for parking violators to pay their original fines.  A late fee both encourages timely payment of the original fee to avoid this problem in the first place and also rectifies the financial harm the City experiences when individuals fail to pay on time.

The costs of the entire parking enforcement department are supported by revenue generated from fines, both the initial fines and the late fee.  The harder it is for the City to collect those payments, the higher the cost of the entire enforcement scheme.  That makes the City's interest in timely payments, an interest supported by the late fee, all the more important as compared to the potential harm to the City.

Along with the monetary harm, the failure to pay the parking fine on time "erodes the government's purposes for proscribing the conduct." *Pimentel I*, 974 F.3d at 923.  As we noted, the City has a legitimate interest in deterring parking violations and promoting compliance, "because overstaying parking meters leads to increased congestion and impedes traffic flow." *Id.* at 924.  The late fee not only

---

[10] Absent from the majority's opinion is any reference to Galperin's letter.  The majority claims that its holding "just requires the government to provide some evidence that the fine amount was not wholly arbitrary." Maj. at 19.  But the Galperin letter (along with the entire record) demonstrates that the fine amount is not remotely arbitrary, much less *wholly arbitrary*, including because it was directly tied to the City's financial interest in the timely payment of parking fines.

further protects the City's traffic-related interests by strengthening the original fee and promoting its prompt payment, but it also helps protect the City's interest in ensuring its regulations are adequately enforced and followed.

The proportionality is highlighted by Plaintiffs' own admissions. Plaintiffs admitted that the City "may have a legitimate interest in timely collection of its fines" and conceded that *some* form of a late fee was appropriate when they argued below that the "initial [late] penalty should be no more than $25." Plaintiffs' counsel again confirmed at oral argument that one of their experts had stated that a late fee should exist and would be reasonable if priced at $25. Oral Arg. at 6:50–6:56. When asked at oral argument whether there was some number which Plaintiffs would say is "facially" constitutional, Plaintiffs responded "yes" but that it should go to a jury to decide whether $63 is too much. Oral Arg. at 6:57–8:45. Thus, the dispute here is not whether the City has a legitimate purpose in imposing the late fee, because Plaintiffs have already agreed that the City does. The real issue is whether $38, the difference between the City's late fee and what Plaintiffs contend is appropriate, renders the late fee so "grossly disproportionate" that the late fee is excessive and therefore unconstitutional.

The late fee here, on its face, is, as a matter of law, reasonable and not excessive. That should have ended the inquiry. In addition, on its face, that late fee is not grossly disproportionate to the harms it is intended to address. That too should have ended the inquiry. Application of the Excessive Fines Clause to the $63 late fee here trivializes the monumental import of the documents from which the Clause sprung—Magna Carta, the English Bill of Rights, and the Virginia Declaration of Rights. And it trivializes the statute

under which Plaintiffs bring their claim—42 U.S.C.
§ 1983.[11]  But that is not the end of the flaws of the majority
opinion.  The majority places our court as the overseer of
state and municipal legislative and executive authority, and
mandate federal court *Civil Rights Act* review of the most
routine of municipal decisions.  This federalism flaws stands
as important as the others just mentioned.  Because I believe
the $63 late fee clearly and undeniably passes constitutional
muster, I respectfully dissent.

---

[11] The majority rejects these contentions by citing to cases that discuss
the importance of the First Amendment.  Maj. at 21–22, 22 n.8.  But a
dispute about that $38 portion of a parking fine is simply not of the same
constitutional import as government prohibiting a person from
expressing views on government policy, *Klein v. City of San Clemente*,
584 F.3d 1196, 1199 (9th Cir. 2009), or a school district penalizing a
student group based on its religious beliefs, *Fellowship of Christian
Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 671–
72 (9th Cir. 2023) (en banc).